**EASTERN PRODUCE CO., Inc., and Charles Taxin, Petitioners,**

**v.**

**Ezra Taft BENSON, Secretary of Agriculture of the United States, Respondent.**

**No. 12964.**

United States Court of Appeals Third Circuit.

Argued March 11, 1960.

Decided May 12, 1960.

Rehearing Denied June 8, 1960.

Tom P. Monteverde, Philadelphia, Pa. (Arlin M. Adams, Josephine H. Klein, Schnader, Harrison, Segal & Lewis,

Philadelphia, Pa., on the brief), for petitioners.

Donald A. Campbell, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Samuel D. Slade, Atty., Dept. of Justice, Washington, D. C., Neil Brooks, Asst. Gen. Counsel, U. S. Dept. of Agriculture, Washington, D. C., on the brief), for respondent.

Before GOODRICH, STALEY and FORMAN, Circuit Judges.

By STALEY, Circuit Judge.

This action was instituted to review and determine the validity of an order made by the Judicial Officer of the United States Department of Agriculture [1] issued under the Perishable Agricultural Commodities Act, 1930, as amended, ("Commodities Act"), 46 Stat. 531, 7 U.S.C.A. § 499a et seq. Two actions have been combined in this administrative proceeding: (1) an action initiated by a complaint against Eastern Produce Co., Inc. ("Eastern"), and (2) an action initiated by a Notice to Show Cause why a license under the Commodities Act should not be denied to Charles Taxin, the president, treasurer, and sole or principal stockholder of Eastern.

In view of the concession by the petitioners that they committed some of the violations of the Commodities Act with which they were charged, the only issue remaining on this appeal is whether the license suspensions ordered by the Secretary of Agriculture were warranted in law.

The facts found by the Judicial Officer, which are amply supported by the record, may be summarized as follows: On January 28, 1958, Taxin, who had held a license under the Commodities Act from December 13, 1950, until December 13, 1957, applied to the Regulatory Branch, Fruit and Vegetable Division, Agricultural Marketing Service, United States Department of Agriculture for a license. His previous license to act as a commission merchant, dealer, or broker to engage in the business of handling fresh and frozen fruits and vegetables in interstate and foreign commerce had lapsed because the annual fee had not been paid. Within a month, on February 25, 1958, the Chief, Regulatory Branch, Fruit and Vegetable Division, filed the Notice to Show Cause why a license should not be denied to Taxin because of past actions of the character prohibited by the Commodities Act while acting as an officer of Eastern. Three days thereafter a disciplinary proceeding was instituted against Eastern, alleging violations of Section 2 of the Commodities Act in that Eastern failed or refused truly and correctly to account and make full payment promptly for numerous shipments of perishable agricultural commodities received in interstate commerce on consignment or joint account. Eastern was the holder of license No. 136579, issued to it on October 24, 1951, and successively renewed on each anniversary date thereafter.

A hearing was held in June, 1958, before a hearing examiner of the Department of Agriculture, at which all parties were represented by counsel. Briefs were thereafter filed, and following issuance of the hearing examiner's report and recommendations on February 17, 1959, exceptions were taken. The hearing examiner found against both Eastern and Taxin and recommended a 75-day license suspension as to Eastern and denial of Taxin's application until the expiration of the same period. The Judicial Officer heard oral argument on May 6, 1959, and thereafter filed a detailed decision and an order which suspended Eastern's license for forty-five days and withheld issuance of Taxin's license until the expiration of this period of suspension.[2]

---

1. The Judicial Officer acted for the Secretary of Agriculture pursuant to authority so delegated to him. 10 Fed.Reg. 13769; 11 Fed.Reg. 177A-233; 18 Fed.Reg. 3219; 18 Fed.Reg. 3648; 19 Fed.Reg. 74.

2. Authority for this action was grounded upon 7 U.S.C. § 499h(a):

"Whenever (a) the Secretary determines * * * that any commission merchant, dealer, or broker has violated any

The Judicial Officer found that from January through May, 1956, Eastern received 53 shipments of perishable agricultural commodities on joint account in interstate commerce and failed to account truly and correctly therefor, underpaying four joint account partners. He additionally found that during the same period Eastern received 20 shipments of perishable agricultural commodities on consignment for which it failed to account truly and correctly and underpaid the consignors. The false accountings and underpayments made by Eastern were found to have been caused by Taxin.

Although conceding that they committed some of the violations of the Commodities Act with which they are charged, petitioners vigorously contend that the sanctions imposed are unlawful inasmuch as the violations were not of such a nature as would warrant their imposition and that before the suspension was ordered full corrective measures had been instituted. In support of the first proposition, petitioners introduced evidence to show that the underpayments made in the 44 transactions with Peninsula Seafood and Produce Company, Inc., which underpayments were admitted, resulted from an attempt by Eastern to collect a claim of $4,000 it allegedly held against Jody Rhodes, president and part owner of Peninsula. The debt was asserted to have arisen as the result of his failure to pay his share of a loss sustained in a joint account transaction involving a tomato crop in Fort Pierce, Florida. To say the least, the evidence regarding this explanation and the entire series of transactions with Peninsula and Rhodes was highly conflicting and dependent upon the credibility of the witnesses. The Judicial Officer thoroughly considered each and every aspect of the evidence and chose, in the main, to disbelieve the petitioners' explanation.

With respect to the remaining transactions, petitioners contended that the false accountings and underpayments represented alleged anticipated clips [3] to be made by Eastern's customers from the purchase price of the produce sold by Eastern on behalf of the shippers. Once again the evidence presented was conflicting, and the Judicial Officer chose to disbelieve some of that proffered by petitioners.[4] In this regard, it is particularly significant that the accountings of the sales rendered to these consignors and joint venturers stated lower unit sales prices and gross proceeds than the actual sales prices and gross proceeds for which the produce was sold to Eastern's customers. The shippers were paid the lesser amounts shown on the accountings which never indicated that deductions had been made, either for anticipated clips or as recoupment for tomato transaction losses.

of the provisions of section 499b of this title * * * the Secretary may publish the facts and circumstances of such violation and/or, by order, suspend the license of such offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender * * *."

Section 499b reads in part:

"It shall be unlawful in or in connection with any transaction in interstate or foreign commerce—

     *      *      *      *      *

"(4) For any commission merchant, dealer, or broker to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is received in interstate or foreign commerce by such commission merchant, or bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer, or the purchase or sale of which in such commerce is negotiated by such broker; or to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had * * *."

3. Deductions made by purchasers of perishable commodities for defects in the quality of the produce delivered to them.

4. Petitioners' evidence failed to prove that the actual clips made by its customers related to any particular lot or lots of produce and therefore comparison of anticipated and actual clips was impossible.

The Judicial Officer in considering the proper remedy for these violations recognized that, despite the broad authority seemingly granted to the Secretary in 7 U.S.C. § 499h(a), the standard to be applied with regard to suspension of licenses was that set forth in Section 9 (b) of the Administrative Procedure Act, 5 U.S.C. § 1008(b). That section provides:

"* * * Except in cases of willfulness * * * no * * * suspension * * * of any license shall be lawful unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements. * * *"

The Judicial Officer made a specific finding of "willfulness" which if supported by the evidence would warrant imposition of the license suspension.

Petitioners, as we have heretofore noted, urge upon this court two grounds for voiding the orders of the Judicial Officer, namely, (1) that inasmuch as full corrective measures had been instituted prior to the time suspension was ordered and no willfulness was shown by the evidence, the orders were arbitrary, capricious and contrary to law, and (2) that the violations were not of such nature as would legally warrant punitive sanctions.

■ It is clear that where willfulness can be shown on the part of individuals violating valid regulations, license suspension is authorized without resort on the part of the agency to notice and opportunity for compliance. 5 U.S.C. § 1008(b). Petitioners assert that the record does not support a finding of willfulness and that the Judicial Officer's conclusion to this effect is inconsistent with his finding of neglect on the part of the petitioners. A fair reading of the Decision and Order rendered by the Judicial Officer indicates that this argument is in great measure semantical. The Decision states: "At the least, underpayment to the shippers involved herein, including Peninsula, in many transactions over a five-month period demonstrates such neglect of the requirements of the act as to constitute willful violations thereof. We conclude that Eastern's willful failures to account truly and correctly and to make full payment promptly to shippers in the many transactions involved herein constitute repeated and flagrant violations of Section 2 of the act." This is not equation of neglect and willfulness but, on the contrary, a finding, although perhaps unartfully phrased, that notorious neglect of explicit provisions of law may be evidence of willfulness. Nor can we subscribe to the proposition that the test of willfulness in this context is to be evil purpose or criminal intent, for this is not a criminal statute. As the Supreme Court stated in United States v. Illinois Central R. Co., 1938, 303 U.S. 239, 242–243, 58 S.Ct. 533, 535, 82 L.Ed. 773:

"* * * In statutes denouncing offenses involving turpitude, 'willfully' is generally used to mean with evil purpose, criminal intent or the like. But in those denouncing acts not in themselves wrong, the word is often used without any such implication. Our opinion in United States v. Murdock, 290 U.S. 389, 394 [54 S.Ct. 223, 225, 78 L.Ed. 381], shows that it often denotes that which is 'intentional, or knowing, or voluntary, as distinguished from accidental,' and that it is employed to characterize 'conduct marked by careless disregard whether or not one has the right so to act.' "

We are convinced that the provisions of the Commodities Act are clear, and the repeated violation thereof by the petitioners fully justified the finding of willfulness by the Judicial Officer.

Petitioners' second contention is equally without merit. It must be remembered that on this appeal we are being asked to review and set aside an order of the Secretary of Agriculture, not to en-

force a cease and desist or like order of a regulatory body. Thus the scope of our review is quite limited,[5] and referral to cases such as Hecht Co. v. Bowles, 1944, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 is unwarranted. As we pertinently stated in Arrow Metal Products Corp. v. Federal Trade Commission, 3 Cir., 1957, 249 F.2d 83, 85, where petitioners sought to have us set aside a cease and desist order issued against them by the Commission:

> "The petitioners complain that the cease and desist order is too drastic and that some other manner of preventing deception, if any, should be adopted. But the matter of shaping a remedy is for the Commission. Our function is simply, in the words of the Supreme Court, to find whether the Commission has made 'an allowable judgment in its choice of the remedy.' Jacob Siegel Co. v. Federal Trade Commission, 1946, 327 U.S. 608, 612, 66 S.Ct. 758, 760, 90 L.Ed. 888. * * "

See also G. H. Miller & Co. v. United States, 7 Cir., 1958, 260 F.2d 286, 296, certiorari denied Miller v. United States, 1959, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed. 2d 572.

Petitioners' extended argument to the effect that this license suspension is purely punitive, not remedial, and thus cannot be justified is simply not persua-sive. The order invokes only a civil, administrative remedy. The issue was put to rest in Helvering v. Mitchell, 1938, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917, where Justice Brandeis indicated that "Remedial sanctions may be of varying types. One which is characteristically free of the punitive criminal element is revocation of a privilege voluntarily granted." We concur with the expressed opinions of the First and Seventh Circuits that "suspension of a registrant is not primarily punishment for a past offense but is a necessary power granted to the Secretary of Agriculture to assure a proper adherence to the provisions of the Act." Nichols & Co. v. Secretary of Agriculture, 1 Cir., 1942, 131 F.2d 651, 659, modified in another particular on rehearing, 1 Cir., 1943, 136 F.2d 503; Daniels v. United States, 7 Cir., 242 F.2d 39, 42, certiorari denied 1957, 354 U.S. 939, 77 S.Ct. 1402, 1 L.Ed.2d 1538.

The Judicial Officer considered all mitigating circumstances in arriving at his decision. Since his order is well within the allowable choice of remedy, we have no right to change the penalty because the agency might have imposed a different one.[6] Moog Industries, Inc. v. Federal Trade Commission, 1958, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370; G. H. Miller & Co. v. United States, supra.

The order will be affirmed.

---

5. Authority is conferred upon us by 5 U.S. C. § 1032, which reads as follows:

"The court of appeals shall have exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of, all final orders (a) of the Federal Communications Commission made reviewable in accordance with the provisions of section 402(a) of title 47, and (b) of the Secretary of Agriculture made under the Packers and Stockyards Act, 1921, as amended, and under the Perishable Agricultural Commodities Act, 1930, as amended, except orders issued under sections 210(e), 217a, and 499g(a) of Title 7, * * *."

6. In a footnote in petitioners' reply brief, they suggest that the orders cannot be sustained unless the violations are "repeated and/or flagrant" as well as "willful" inasmuch as the Judicial Officer made both findings. This argument is unsound inasmuch as the statute is clear that the Secretary, if he makes a finding of willfulness, has authority to suspend licenses for not only forty-five days but up to and including ninety days. In any case, there is no doubt that this finding of the Judicial Officer has ample support, for a mere lumping of similar illegal acts into categories cannot conceal their number.