991 F.2d 803
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
James Joseph HICKEY; Shannon Hansen, Petitioners,
v.
DEPARTMENT OF AGRICULTURE, Respondent.
 No. 91-70169.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 18, 1992.
Submission Deferred March 3, 1993.
Resubmitted April 21, 1993.
Decided April 23, 1993.
 
 Before: BEEZER, NOONAN and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 James Joseph Hickey and his wife Shannon Hansen petition to review the decision of the Department of Agriculture to impose fines and license suspension against their animal facilities for various violations of the Animal Welfare Act (AWA), 7 U.S.C. §§ 2131 et seq (1988); 9 C.F.R. §§ 1.1-12.10 (1991). We have jurisdiction under 7 U.S.C. § 2149(c) (1988) to review final decisions by the Secretary of Agriculture. We find substantial evidence to support the imposition of fines and the suspension of Hickey's license and deny the petition.
 
 
 3
 * BACKGROUND
 
 
 4
 Hickey was issued a license on June 10, 1988, under the business name "S.H. Supply", to act as a Class B animal dealer. Under the license, he operated two animal facilities: a feline facility in Albany, Oregon, and a canine facility at Lebanon, Oregon. The animal dealership, which sold cats and dogs for use in medical research, was the largest such dealership on the West Coast, with annual sales of over 1200 animals grossing approximately $100,000.
 
 
 5
 Inspectors from the Animal and Plant Health Inspection Service [APHIS] of the Department of Agriculture conducted five inspections of petitioner's animal facilities from August 25 to October 26, 1988. As a result of these inspections, the Department of Agriculture cited Hickey with twenty violations of the AWA. On January 22, 1990, a chief administrative law judge issued an initial Decision and Order suspending Hickey's license for one year, prohibiting Hickey's wife Hansen from obtaining a license during that year, assessing a civil penalty of $10,000, and directing petitioners to cease and desist from various violative practices. With a few minor exceptions, this decision and order was upheld by a Department of Agriculture Judicial Officer ["JO"] on February 8, 1991.
 
 II
 STANDARD OF REVIEW
 
 6
 "[T]he scope of our review of administrative decisions is narrow: administrative agency decisions will be upheld unless 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...' " Farley and Calfee, Inc. v. Department of Agric., 941 F.2d 964, 966 (9th Cir.1991) (quoting 5 U.S.C. § 706(2)(A) (1988)). We must uphold the JO's findings if they are supported by substantial evidence. Spencer Livestock Comm'n v. Department of Agric., 841 F.2d 1451, 1454 (9th Cir.1988). We must give the agency broad latitude in fashioning sanctions. "[W]here Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy the relation of remedy to policy is peculiarly a matter for administrative competence" Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185 (1973) (quotation omitted). Our review of sanctions "is limited to determining whether the remedy chosen was the result of an allowable judgment." Farley, 941 F.2d at 966 (quotation omitted).
 
 III
 VIOLATIONS AND FINES
 
 7
 We find that substantial evidence supports the Secretary's determination that twenty-two violations of the AWA were committed by Joe Hickey and Shannon Hansen.
 
 
 8
 * RECORDKEEPING VIOLATIONS
 
 
 9
 There was substantial evidence to support the Judicial Officer's finding of thirteen recordkeeping violations of the AWA. Hickey challenges the finding that one inspection turned up nine missing cats. Hickey claims the cats appeared to be missing because they were counted twice on one day and once on the next. We conclude it was not arbitrary and capricious for the JO to find Hickey's explanation was "imaginative" and "post hoc." Moreover, the JO found the heart of this violation was the sloppiness of Hickey's recordkeeping and his "failure to provide inventory records at the time of the August 25th inspection showing the whereabouts of every acquired animal." Failure to do this was a violation of both 7 U.S.C. § 2140 and 9 C.F.R. § 2.126(a).
 
 
 10
 Hansen and Hickey also claim there was a lack of substantial evidence that seven cats, rejected from a facility in Sepulveda, California, were missing. Hickey and Hansen claim the inspectors merely failed to inspect the records reflecting the cats' return. However, there was evidence presented that the inspectors did view these records, and it was only after these records were viewed and copied that the whereabouts of these cats was noted in the records. Moreover, as the government points out, one of the seven cats remained unaccounted for. Because the records failed to show when the cats were returned to the inventory, in violation of 9 C.F.R. § 2.75(a)(1), there was no error in the ALJ's finding that this constituted one violation with a penalty of $1000.
 
 
 11
 Hickey and Hansen also contest the fines for failing to enter into their inventory 35 dogs acquired from the pound. Hickey and Hansen claim that because they acquired these dogs from the pound, they were not required to record their acquisition. This contention is incorrect. There is no exception to the recordkeeping requirement for dogs acquired without charge. "When live dogs or cats are held, purchased, or otherwise acquired, they shall be immediately identified." 9 C.F.R. § 2.50(b)(1) (emphasis added). "Each dealer ... shall make, keep, and maintain records or forms which fully and correctly disclose the following information concerning each dog or cat purchased or otherwise acquired." 9 C.F.R. § 2.75(a)(1) (emphasis added).
 
 
 12
 Hickey and Hansen also claim they were cited for keeping business records at home instead of at the cat facility, which is not a violation. This is why, they argue, there were no records to inspect at the cat facility. However, there was substantial evidence that, irrespective of where the records were kept, Hickey and Hansen failed to make records available upon request on four separate occasions.
 
 B
 FACILITIES VIOLATIONS
 
 13
 First, Hickey claims that because he was one of the largest animal dealers on the West Coast, he should not have been cited when one dog had running eyes. He claims one diseased dog does not indicate a lack of proper veterinary care. However, Dr. Overton, Department veterinarian, testified that this condition was extremely painful to the animal and the condition had been an ongoing problem. The JO found, however, that because the suffering was not great, the fine would only be $500--not the possible $2500. We allow a great deal of discretion to the agency in the determination of fines. Butz, 411 U.S. at 185. We conclude this fine was reasonable and warranted.
 
 
 14
 At the "bag plant," the inspectors found that twenty-eight cats were housed in a closed facility which was not designed for cats and lacked adequate ventilation or lighting. All the doors and windows were shut and there were no fans or air conditioning in the middle of summer. The appellants claim that the facility could have been adequately lit or ventilated, even if it was not at that time. However, this fact is irrelevant, for the regulations require ventilation at all times, and lighting during business hours. 9 C.F.R. §§ 3.2(b) and (c).
 
 
 15
 The inspectors also found a cat that was being permanently housed in a burlap bag. Hickey claims that he had no knowledge of a cat found by inspectors at the bag plant. However, as the JO found, "[i]nasmuch as respondents chose to house cats at the 'bag plant,' it became a facility subject to all APHIS regulations governing humane care and treatment." Once subject to these regulations, it was a violation to house any cat in a bag. See 9 C.F.R. § 3.4(a). The finding that the burlap bag was this cat's primary housing was supported by substantial evidence. Moreover, Hansen and Hickey were in violation of 9 C.F.R. § 2.50(a)(1), because none of the 28 cats at the bag plant wore tags.
 
 
 16
 Finally, Hickey contests the finding that cats were left tied up in red onion sacks. There was testimony that the cats were delivered in cages and then transferred to the onion sacks. Moreover, the inspectors found four or five cats bound in bags lying on the ground. Although Hickey claimed no knowledge of the practice, the JO found his testimony to lack credibility. There was substantial evidence to support the JO's finding that the use of onion sacks was customary at the facility.
 
 C
 DENIAL OF ACCESS
 
 17
 The appellants argue that the APHIS inspectors were not denied access to their facilities on the several occasions for which they were cited. Their arguments are meritless.
 
 
 18
 On August 26, 1988, there was substantial evidence that Hickey accosted and verbally abused the inspector of his dog facility. Hickey told the inspector that he was going to stop him from inspecting. The JO properly found that such abuse limits the access to the facility in violation of 9 C.F.R. § 2.126(a) and 7 U.S.C. § 2140, which require access by APHIS inspectors to the facility and business records during business hours.
 
 
 19
 On September 1, 1988, inspectors were screamed and cursed at by Marie Hickey, Joe Hickey's mother, when they tried to inspect the dog facility. Even though the inspectors did eventually inspect the facility, the actions of Marie Hickey can be imputed to Hickey as his agent. "When construing or enforcing the provisions of this chapter, the act, omission, or failure of any person acting for or employed by ... a dealer ... shall be deemed the act, omission, or failure of such ... dealer ... as well as of such person." 7 U.S.C. § 2139.
 
 
 20
 On October 26, 1988, Hickey admits to refusing an inspection of his dog facility. Hickey claims that because his animal dealer's license was under a 21-day suspension, he was not a dealer at that time, and the inspector was not authorized to inspect his facility. This argument has no merit. The AWA explicitly allows APHIS to inspect dealerships--even those with suspended licenses--to ascertain whether they were violating the suspension order. Title 7 U.S.C. § 2146(a) authorizes the Secretary to make "such investigations or inspections as he deems necessary to determine whether any dealer ... has violated or is violating any provision" of the AWA. The JO properly found that "[n]othing restricts this authority of inspection to licensed dealers. All dealers are subject to investigations and inspections, and a dealer is defined to include any person who, in commerce, buys or sells dogs or other animals for research and derives over $500.00 gross income from those sales during any calendar year."
 
 IV
 LICENSE SUSPENSION
 
 21
 The Department may suspend a license to operate an animal facility in only limited circumstances:
 
 
 22
 Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given--(1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements.
 
 
 23
 5 U.S.C. § 558(c) (1988). It is undisputed petitioners did not receive notice of the violations nor were they given an opportunity to demonstrate or achieve compliance with the requirements they were determined to have violated.
 
 
 24
 Instead the Judicial Officer determined Hickey and Hansen had acted "willfully" and thus no notice was necessary. In reaching this determination, the JO stated: "Respondents contend that the violations were not willful, but a violation is willful if it is done intentionally or with careless disregard of statutory requirements." To support that standard, the JO cited with approval In re Capital Produce Co., 49 Agric.Dec. 531 (1990). However, the Fourth Circuit has since reversed the Judicial Officer's decision in that case and established a higher standard of "willfulness." Capital Produce Co. v. United States, 930 F.2d 1077, 1079 (4th Cir.1991). (Willfulness for purposes of Section 558(c) means an intentional misdeed or such gross neglect of a known duty as to be the equivalent thereof.)
 
 
 25
 The Fourth Circuit's reversal of the Judicial Officer's standard of willfulness in Capitol Produce, however, does not alter the complexion of this case. The JO in this case could have relied on Ninth Circuit precedent in applying the "careless disregard" standard of willfulness. In Lawrence v. Commodity Futures Trading Comm'n, 759 F.2d 767, 773 (9th Cir.1985), we stated that "it is well settled" that if a person " 'acts with careless disregard of statutory requirements, the violation is willful.' " (quotations omitted). "To establish willfulness, the [agency] only needed to show that [petitioner's] ongoing failure to act was intentional as opposed to accidental. Proof of an evil motive is unnecessary." Id. Notwithstanding the reversal of In re Capitol Produce by the Fourth Circuit, the judicial officer in this case applied the correct standard of "willfulness."
 
 
 26
 There was substantial evidence that many of the violations were at the very least intentional failures to act and were in careless disregard of the statutory and regulatory requirements. The JO found that Hickey acted defiantly and confronted the inspecting officers. He observed Hickey "did not believe the standards applied" and thus "did not comply with the standards." Hickey was "indifferent to the distress and shock experienced by the animals he buys and sells." There was substantial evidence to support these conclusions and the JO's determination was not an abuse of discretion.
 
 
 27
 Hickey and Hansen also argue that even if the suspension of Hickey's license were justified, Hanson did not engage in the violations and therefore is entitled to receive the license she applied for. We agree with the JO that
 
 
 28
 [t]o accept Ms. Hansen's arguments would permit sham and subterfuge. A family operated dealership would be allowed to continue unaffected by the suspension order that is being entered. The suspension order would be rendered meaningless and the objectives of the Act would be subverted if a new dealer's license were issued to Ms. Hansen, who actively participated in the existing dealership's operations.
 
 
 29
 There was substantial evidence that both Hansen and Hickey played an active role in the violations. It was Hansen who was first issued a license on August 17, 1987. At that time, she operated a cat facility with her then-fiance Hickey in Albany, Oregon. After they were married, the license was reissued to reflect Hickey as the owner. Hickey then took control of his parent's dog facility in Lebanon, Oregon. Although Hansen's license was reissued to Hickey, there was substantial evidence that Hansen, as well as Hickey, continued to play an active role in the cat facility. We consider Hansen an agent of Hickey, and as such she was responsible for and participated in the violations upon which the suspension was based.
 
 
 30
 Any person who has been or is an officer, agent, or employee of a licensee whose license has been suspended or revoked and who was responsible for or participated in the violation upon which the order of suspension or revocation was based will not be licensed within the period during which the order of suspension or revocation is in effect.
 
 
 31
 9 C.F.R. § 2.9. Therefore denial of Hansen's license application was appropriate. See also Mattes v. United States, 721 F.2d 1125, 1129-32 (7th Cir.1983) (upholding denial of wife's application under Packers and Stockyards Act on ground that granting it would allow her husband to bypass suspension order).
 
 V
 AMOUNT OF SANCTIONS
 
 32
 Hickey and Hansen claim the sanctions imposed were excessive. It should be noted that although the civil penalties were assessed at $25,750, the actual civil penalty ordered was only $10,000. In assessing civil penalties, the Secretary must consider "the size of the business of the person involved, the gravity of the violation, the person's good faith, and the history of previous violations." 7 U.S.C. § 2149(b). In the instant case, Hickey and Hansen grossed over $100,000 a year, the ALJ and JO found that the violations were serious, and there was substantial evidence that Hickey and Hansen's actions were not in good faith. There was no error.
 
 
 33
 Because of Hansen's active role in the operation and the resulting violations, the JO also properly assessed the monetary penalties against both Hickey and Hansen.
 
 
 34
 The petition for review is DENIED.
 
 
 35
 NOONAN, Circuit Judge, concurring and dissenting:
 
 
 36
 I concur in the disposition except that I believe that willfulness cannot be equated with negligence, contrary to the dictum from Lawrence cited by the court.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3